UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES LEE NEFF,                    :
                                   :CIVIL ACTION NO. 3:14-CV-2278
          Plaintiff,               :
                                   :(JUDGE CONABOY)
          v.                       :
                                   :
CAROLYN W. COLVIN,                 :
Acting Commissioner of            :
Social Security,                   :
                                   :
          Defendant.               :

_____


                           **MEMORANDUM**


     Here we consider Plaintiff's appeal from the Commissioner's

termination of benefits under the Supplemental Security Income

("SSI") program, Title XVI of the Social Security Act, 42 U.S.C. §

1381 *et seq.*  (Doc. 1.)  Plaintiff was originally found to be

disabled as of January 28, 2008, with the March 29, 2010, decision

of Administrative Law Judge ("ALJ") Donald Graffius who found that

Plaintiff's severe impairments of Crohn's disease, arthritis in the

left knee, foot and toe, and morbid obesity prevented him from

working forty hours a week.  (R. 86-91.)  With her decision of May

17, 2013, ALJ Paula Wordsworth addressed the issue of whether

Plaintiff continued to be disabled under section 1614(a)(3)(A) of

the Social Security Act and determined that Plaintiff's disability

ended on December 1, 2011, and Plaintiff had not become disabled

again since that date.  (R. 25.)  Plaintiff asserts that this

determination is error for the following reasons: 1) Plaintiff

proved disability through November 30, 2011 (Doc. 15 at 3-4); 2) medical improvement had not occurred as of December 1, 2011 (*id.* at 4-12); 3) the ALJ relied on a flawed and incomplete hypothetical question to the VE (*id.* at 12-15); and 4) the ALJ improperly rejected the opinion of treating physician Dr. Donald Mandetta (*id.* at 15-18).  For the reasons discussed below, we conclude this matter must be remanded to the Acting Commissioner.

### I. Background

### A. Procedural Background

On December 16, 2011, the Commissioner determined that Plaintiff was no longer disabled as of December 1, 2011.  (R. 25.) This decision was upheld upon reconsideration after a disability hearing by a State agency Disability Hearing Officer.  (*Id.*) Plaintiff then filed a timely request for a hearing before an ALJ. (*Id.*)  A video hearing was held by ALJ Wordsworth on April 19, 2013.  (R. 25, 42.)  Plaintiff, represented by attorney Sharon Gornstein, testified as did Vocational Expert ("VE") Linda Dezack. (*Id.*)   In ALJ Wordsworth's May 17, 2013, decision, she concluded that, at the time of the decision, Plaintiff had the medically determinable impairments of Crohn's disease, obesity, depression, and anxiety disorder which, since December 1, 2011, did not alone or in combination meet or equal the listings.  (R. 27-29.)   The ALJ, following the seven-step evaluation process used to determine if a claimant continues to be disabled, found that beginning on

2

December 1, 2011, Plaintiff had the residual function capacity ("RFC") for light work with certain nonexertional limitations and that he was capable of performing jobs that existed in significant numbers in the national economy. (R. 30-34.) The ALJ therefore found that Plaintiff's disability ended on December 1, 2011, and he had not become disabled since that time. (R. 35.)

On July 1, 2013, Plaintiff requested a review with the Appeal's Council. (R. 19-20.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision on September 30, 2014. (R. 1-4.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

## B.   *Factual Background*

Plaintiff was born on July 11, 1975, and was thirty-six years old on December 1, 2011. (R. 34.) Plaintiff testified that he received a high school diploma online. (R. 48.) Plaintiff worked in the past as a webmaster, store clerk, loader/unloader, and a mover's helper. (R. 71-72.) At the time of the hearing, Plaintiff was living in Pinegrove, Pennsylvania, with a roommate (at other times described as his fiancee) and her daughter. (R. 48, 280.) He was receiving SSI, some money from the state, and food stamps. (*Id.*)

## 1.   **Impairment Evidence**

Because medical improvement is a comparative inquiry, we include in our summary impairment evidence preceding the comparison

3

point decision.  We also focus on evidence related to Plaintiff's severe impairment of Crohn's disease because this is the subject of his asserted errors.

On June 10, 2009,  Donald Mandetta, M.D., the specialist who treats Plaintiff's Crohn's disease, noted that "[b]ecause of frequent stools with urgency there is a strong probability that his symptoms may be a consequence of bile salt malabsorption from his ileectomy."  (R. 451.)  Dr. Mandetta also reported that

> [a]t the present time he has found himself
> unemployable.  He is qualified only for
> menial jobs.  Every job he has ever had has
> terminated him because of his symptoms are so
> unpredictable and his disability days so
> frequent that he simply can't be a reliable
> employee because of multiple sick days.
> Also, he is somewhat fragile psychologically.
> He has absolutely no tolerance for any kind
> of stress.  Nerves and anxiety just
> incapacitate him and seem to increase his
> bowel abnormalities.  He has requested we
> assess him for disability at this time.  We
> will do that.

(R. 451.)

On October 7, 2009, Dr. Mandetta found that Plaintiff's symptoms at the time were minimal with no abdominal pain and stool frequency more than average with some associated urgency.  (R. 450.)

On April 7, 2010, Dr. Mandetta noted that Plaintiff had "absolutely no abdominal pain, his bowel habit frequency was substantial (from two to ten movements per day), and his joints seemed to be better.  (R. 449.)  Dr. Mandetta recorded the

4

following Assessment: "History of iliocecal Crohn's disease with diarrhea likely related to bile salt malabsorption." (*Id.*)

On November 15, 2010, Plaintiff denied abdominal pain and did not express bowel or urinary complaints. (R. 345.)

On January 12, 2011, Dr. Mandetta made the following notes of Plaintiff's visit:

> The patient is a 35-year-old single man with a longstanding history of Crohn's disease. He underwent partial ileectomy and right hemicolectomy in 1999 for performation with abscess. He has been difficult to treat because of psychosocial circumstances. He currently is taking 3 Asacol tablets a day, sometimes takes his Colestid, and treats himself periodically for acute exacerbation of symptoms. However, because of choleraic diarrhea what he interprets as a flare up might actually not be related to his Crohn's but rather to his surgery. Comparing the last 30 days of bowel habit records with summer and fall of 2010 we see a marked improvement. He is now having 20 to 24 bowel movements per week whereas in June and July of last summer he was having over 50 stools a week. He has no abdominal pain. He has no systemic symptoms. He has not lost any weight. There has been no change in appetite. He has no joint symptoms except for painful shoulders which he inexplicably attributes to Asacol. I suggested to the patient that he is now long overdue for a colonoscopy to assess the current state of his disease but he says that will not be possible because of his current circumstances.
>
> ASSESSMENT: Crohn's disease, status uncertain but symptomatically better than he was 6 months ago.

(R. 344.)

On March 25, 2011, Plaintiff was seen at the Family Practice Center in Shamokin Dam, Pennsylvania, to establish new patient care and get a referral to a gastroenterologist.  (R. 363.)  Plaintiff reported that he had just moved to the area from Centre County and had been diagnosed with Crohn's disease eleven years earlier—he had been seeing a gastroenterolgist there every six to twelve months.  (*Id.*)  He also reported that he took Asacol "which helps a lot," took Prednisone for flare-ups and Colestipol if had loose stools "but rarely needs it."  (*Id.*)  Plaintiff stated that he was doing well at the time and denied any problems, specifically denying fatigue, malaise, black stools, constipation, diarrhea, nausea, or vomiting.  (*Id.*)  Plaintiff was assessed to have gastroenteritis and colitis, was found to be stable and was to continue his medication regimen.  (R. 364.)  He was referred to gastroenterologist Glenn Freed, D.O.  (*Id.*)

On November 14, 2011, Glenn Freed, D.O., saw Plaintiff for an upper GI and small bowel exam.  (R. 391.)  Dr. Freed recorded the following impression: "Status post large bowel surgery . . . [and] [n]o evidence of persistent or recurrent Crohn's disease."  (*Id.*)

On October 10, 2012, Dr. Mandetta noted that Plaintiff had a history of perforated Crohn's disease of the ileum with "a huge abdominal abscess several decades ago."  (R. 480.)

> Since his surgery he has had intermittent
> symptoms sometimes suggestive of transient
> incomplete small bowel obstruction, sometimes
> suggestive of bile salt mediated diarrhea and

at other times consistent with recurrent
Crohn's disease.  Because of significant
psychosocial issues the patient has not been
entirely compliant with prescriptions, office
appointments, x-rays and endoscopy.  We have
not been able to colonscope him to really
know whether or not he has recurrent disease
after having had a partial ileocolectomy.  He
had a small bowel x-ray here in 2007 which
showed . . . no definitive radiographic
evidence for recurrent disease.  He states
that he had a small bowel follow-through
elsewhere in 2011 which also did not show
clear evidence for Crohn's disease.  He has
extremely variable bowel habits but is prone
to frequent stools, averaging 35-50 bowel
movements per week.  He can reduce this by
taking the Colestid which was prescribed.  He
is instructed to take Colestid 1 g t.i.d. to
q.i.d. but actually takes the Colestid
sporadically.  He is prescribed mesalamine
800 mg t.i.d.  He usually takes it at least
b.i.d. but often misses the third dose.  When
he feels that he has a "flare up" of Crohn's
disease he insists on taking a short course
of prednisone . . . ; it is almost certain
that most, if not all of these "flareups" do
not represent Crohn's disease.  He currently
is on disability.  I don't believe he has
ever had a significant job history.  He does
not drive.  He currently has no abdominal
pain.  His bowel movement frequency is
substantially less compared to several years
ago.  He has 1-5 bowel movements a day
depending on his diet and whether or not he
takes Colestid. . . .

Assessment: 37-year-old with a remote
history of complicated, perforated Crohn's
disease . . . .  Since his surgery many years
ago he has not had definitive evidence of
recurrent disease . . . .  His treatment and
surveillance has been very sporadic.  He has
not had appropriate laboratory surveillance.
He hasn't consented to colonoscopy.  The last
time I was able to convince him to at least
have a small bowel follow-through x-ray was
2007.  He usually takes the Asacol every day

> but the dose varies from 800 mg to 2400 mg.
> His use of Colestid is sporadic and is based
> on his recent diarrhea history.  He is not
> comfortable without having the personal
> option of treating himself with prednisone.
> Fortunately, his prednisone use is typically
> brief and he has never suffered any
> complications from steroid use.  He currently
> lives quite far from here.  He isn't
> particularly satisfied with treatment he gets
> there.  He sees me as his way of getting his
> prescriptions renewed.
>
> Although our relationship is far from
> ideal, at least I am able to provide some
> medication and advice.  If he ever gets into
> serious trouble with his disease or some
> other intercurrent illness I suspect he will
> try to get here.

(R. 480.)

On February 15, 2013, Plaintiff was seen for follow up of his Crohn's disease by Rachelle Hoover, CRNP, of Mount Nittany Physician Group, and he reported he was doing well.  (R. 466.)  He had been evaluated by her colleague four months before at which time he had presented with abdominal pain and diarrhea.  (*Id.*)  Ms. Hoover reported that Plaintiff denied abdominal pain or cramping, diarrhea and rectal urgency were stable, and he denied rectal bleeding.  (*Id.*)  She noted that Plaintiff was not adherent with his medication regimen, reporting intolerance.  (*Id.*)  Ms. Hoover noted that she had a long discussion with Plaintiff about Crohn's management, explaining the importance of routine laboratory and colonoscopic evaluation.  (R. 468.)  She stated that Plaintiff wished to consider the recommended colonoscopy further.  (*Id.*)  She

also explained that systemic steroid use should be avoided and
without evidence of active Crohn's disease (his last small bowel
study in 2011 was consistent with inactive Crohn's disease), it was
difficult to justify Prednisone.  (*Id.*)

## 2.   __Opinion Evidence__

Candelaria Legaspi, M.D., a non-examining State agency medical
consultant, completed a Physical Residual Functional Capacity
Assessment on December 2, 2011.  (R. 366-72.)  Dr. Legaspi
recognized Plaintiff's history of Crohn's disease with flare-ups
and that he had previously been found disabled by an ALJ because
frequent bowel movements rendered him unable to sustain a job.  (R.
371.)  Dr. Legaspi noted that Plaintiff had not had any acute flare
ups or exacerbations of the disease, and the diarrhea was related
to surgery and not Crohn's disease, that Plaintiff's treating
physician as of January 2011 had noted marked improvement comparing
bowel habit records from 50 per week to 20 to 25 per week, and that
Plaintiff had no abdominal pain and no systemic symptoms.  (*Id.*)
Dr. Legaspi cited a March 2011 new patient visit where Plaintiff
reported that Asacol helps a lot, he used Prednisone for flare-ups
and Colestipol for loose stools but "rarely" needed it, and denied
fatigue, black stools, diarrhea, constipation, nausea or vomiting.
(R. 372.)  This was contrasted with the comparison point decision
when Plaintiff had frequent bowel movements.  (*Id.*)  Dr. Legaspi
determined that Plaintiff's statements about the limiting effects

of his symptoms were partially credible, citing his medical
history, the character of his symptoms, his activities of daily
living, the type of treatment he received, and other measures he
took to relieve his symptoms.  (*Id.*)  Finding that the record
showed that treatment had generally been successful in controlling
Plaintiff's symptoms and Plaintiff had attained significant medical
improvement, Dr. Legaspi opined that Plaintiff was capable of
medium work.  (R. 372.)

On January 19, 2012, Dr. Mandetta, identified as Plaintiff's
"former" gastroenterologist, completed a Crohn's & Colitis Residual
Functional Capacity Questionnaire.  (R. 425-28.)  He noted that
Plaintiff had the following symptoms: chronic diarrhea, abdominal
pain and cramping, fever, vomiting, nausea, malaise, fatigue, and
sweatiness.  (R. 425.)  He noted that at Plaintiff's last visit on
January 12, 2011, he denied having pain and, at that time,
Plaintiff was having 20 to 24 bowel movements per week, adding that
Crohn's flares are random and unpredictable, and Plaintiff was very
stress sensitive.  (*Id.*)  Dr. Mandetta opined that Plaintiff was
incapable of handling even low stress jobs, would need to take 5 to
10 unscheduled restroom breaks per day, that his impairments were
likely to produce good days and bad days and that Plaintiff was
very fragile psychologically.  (R. 426-28.)

Dr. Mandetta completed another questionnaire on December 5,
2012, in which he identified the symptoms noted in January 2011.

(R. 443.)  He stated that he had last seen Plaintiff in October 2012 and Plaintiff denied having abdominal pain.  (*Id.*)  Plaintiff reported 30 to 35 bowel movements per week and unpredictable episodes of diarrhea.  (*Id.*)  The remainder of the information provided in the form was essentially the same as that provided in January 2011.  (R. 426-28, 444-46.)

**3.     Function Reports**

   In Function Reports dated November 9, 2011, and January 29, 2012, Plaintiff said that his conditions limited his ability to work because his Crohn's disease flares up unexpectedly causing him to have to go the bathroom urgently and frequently and his arthritis also flares up without warning.  (R. 280, 306.)  In the November 2011 report, Plaintiff averred that his conditions affected his ability to bend, stand, walk, kneel, climb stairs, and complete tasks.  (R. 285.)  In the January 2012 Report Plaintiff reported only his abilities to complete tasks and concentrate were affected.  (R. 311.)

**4.     Hearing Testimony**

   At the hearing held on April 19, 2013, Plaintiff testified that he had last worked in 2005 or 2006.  (R. 49.)  In response to the question of why he believed he continued to be disabled, Plaintiff responded

> [t]here are times that I just have little or
> no control over my bowel habits and that
> could be in a work situation and I could need
> from five to up to 15 minutes just for a

11

> bathroom break alone.  There'd be no way an
> employer would want to keep me, seeing if I
> need to be in the restroom that many minutes,
> they're just going to say we're terminating
> you.

(R. 49.)  Plaintiff said he experienced four to fifteen or more

bowel movements daily.  (R. 55.)  Plaintiff testified that he tried

to minimize the Crohn's symptoms with diet but that was not very

successful.  (R. 63.)  He also said that his ability to lift is

limited by the disease--the strain of lifting more than ten pounds

could lead to a flare up--and his doctor had advised him to limit

lifting.  (R. 64.)  Plaintiff's attorney said that Plaintiff sees

the Crohn's specialist, Dr. Mandetta, "approximately yearly and

that's obviously what he thinks needs to be done or he would have

him come more often."  (R.  55.)

     Plaintiff also reported that his arthritis requires postural

changes and limits the amount of time he can sit and stand.  (R.

61.)  He said he takes over-the-counter pain medicine for this

condition--his doctor has not prescribed medication and will not

until Plaintiff sees a bone and joint specialist.  (R. 60.)

     The ALJ asked the VE to consider a hypothetical individual of

similar age and experience as Plaintiff and

> further assume the individual is limited to
> performing light work, with occasional
> climbing ropes, ladders, and scaffolding.
> Occasional balancing, bending, crouching,
> stooping, kneeling, and crawling.  The
> individual can perform simple, routine tasks,
> involving work-related decisions with few
> workplace changes.  The individual can hold

> no work at a fixed production rate or speed
> and may have occasional contact with
> supervisors and coworkers and the public.

(R. 72-72.)  The VE identified jobs which such an individual could
perform: housekeeper/cleaner, laundry worker, and garment sorter.
(R. 73.)  The ALJ then added that the individual would also
"require the opportunity to alternate between sitting and standing
every two hours with standing and walking a total of four hours in
an eight-hour workday.  The individual--there would also be access
to the restroom."  (R. 73-74.)  The VE responded that the laundry
work and garment sorter positions would be available to such an
individual.  (R. 74.)  When the ALJ added that the hypothetical
individual would be off task for twenty percent of the day due to
taking unscheduled restroom breaks and would be absent from work at
least three days per month due to his impairment or treatment, the
VE testified that competitive work would not be available for such
an individual.  (R. 76.)

**5.   ALJ Decision**

     ALJ Wordsworth rendered her decision on May 17, 2013.  (R. 25-
36.)  She made the following findings of fact and conclusions of
law:

> 1.  The most recent favorable medical
> decision finding that the claimant was
> disabled is the decision dated March 29,
> 2010.  This is known as the "comparison point
> decision" or CPD.
>
> 2.  At the time of the CPD, the claimant had
> the following medically determinable

13

impairments: Crohn's disease, arthritis in the left knee, foot and toe and morbid obesity. These impairments were found to result in the residual functional capacity to perform work at the sedentary exertional level with the inability to work forty hours weekly, or the equivalent; must avoid stooping, kneeling, crouching, crawling and climbing; limited to occupations which allow unscheduled three to eight times in eight hours with little or no notice access to a restroom; limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple work-related decisions and in general relatively few work place changes; required low stress tasks; and required time off task and absences in excess of customary industry allowances.

3. The medical evidence establishes that, as of December 1, 2011, the claimant had the following medically determinable impairments: Crohn's disease, obesity, depression and anxiety disorder. These are the claimant's current impairments.

4. Since December 1, 2011, the claimant has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

5. Medical improvement occurred as of December 1, 2011 (20 CFR 416.994(b)(1)(i)).

6. As of December 1, 2011, the impairments present at the time of the CPD had decreased in medical severity to the point where the claimant had the residual functional capacity to perform work at the light exertional level except he was limited to occasionally climbing, ropes, ladders and scaffolds; was limited to occasionally bending, balancing, crouching stooping, kneeling, and crawling; was limited to simple, routine tasks involving no more than simple, short

14

instructions and simple work-related
decisions with few work place changes; had to
avoid work at a production rate pace; was
limited to occasional contact with
supervisors, co-workers and the public;
required the opportunity to alternate between
sitting and standing every two hours with
standing ans walking at a total of four hours
in an eight-hour workday; and required ready
access to the restroom.

7.   The claimant's medical improvement is
related to the ability to work because it has
resulted in an increase in the claimant's
residual functional capacity (20 CFR
416.994(b)(2)(iv)(B)).

8.   Beginning on December 1, 2011, the
claimant has continued to have a severe
impairment or combination of impairments (20
CFR 416.994(b)(5)(v)).

9.   Beginning on December 1, 2011, based on
the current impairments, the claimant has had
the residual functional capacity to perform
light work as defined in 20 CFR 416.967(b)
except he is limited to occasionally
climbing, ropes, ladders and scaffolds; is
limited to occasionally bending, balancing,
crouching, stooping, kneeling, and crawling;
is limited to simple, routine tasks involving
no more than simple, short instructions and
simple work-related decisions with few work
place changes; must avoid work at a
production rate pace; is limited to
occasional contact with supervisors, co-
workers and the public; required the
opportunity to alternate between sitting and
standing every two hours with standing and
walking at total of four hours in an eight-
hour workday; and requires ready access to
the restroom.

10.   Beginning on December 1, 2011, the
claimant has been unable to perform past
relevant work (20 CFR 416.965).

11.   On December 1, 2011, the claimant was a

younger individual age 18-49 (20 CFR 416.963).

12.  The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

13.  Beginning on December 1, 2011, transferability of job skills is not material to the determination of disability . . . .

14.  Beginning on December 1, 2011, considering the claimant's age, education, work experience, and residual functional capacity based on the current impairments, the claimant has been able to perform a significant number of jobs in the national economy (20 CFR 416.960(c) and 416.966).

15.  The claimant's disability ended on December 1, 2011, and the claimant has not become disabled again since that date (20 CFR 416.994(b)(5)(vii)).

(R. 26-35.)

In determining Plaintiff's medical improvement and residual functional capacity, the ALJ's record citations included the following: Plaintiff's January 2011 visit with Dr. Mandetta where Dr. Mandetta noted that Plaintiff was symptomatically better; Dr. Mandetta's January 2012 opinion; Plaintiff's October 2012 visit with Dr. Mandetta where Dr. Mandetta noted that Plaintiff had not been compliant with treatment or cooperative with diagnostic studies, he had extremely variable bowel habits and no abdominal pain, his bowel movement frequency was substantially less compared to several years ago, and there were no extraintestinal or systemic signs related to Crohn's; and Plaintiff's February 13, 2013, visit

16

with CRNP Hoover where Plaintiff reported he was doing well in relation to his Crohn's disease.  (R. 31-33.)

Regarding opinion evidence, the ALJ gave some weight to state agency medical consultants including Dr. Legaspi, and little weight to Dr. Mandetta's opinions.  (R. 34.)  ALJ Wordsworth provided the following justification for the latter: "Dr. Mandetta's treatment and progress notes show that the claimant has had limited treatment and further shows that the claimant's Crohn's disease was not active.  In fact, in February 2013, the treatment notes show and the claimant was without any evidence of active Crohn's disease." (R. 34 (citing Exhibits 10F, 12F, 13F, 14F and 15F).)

ALJ Wordsworth also noted that, because she found Plaintiff could not perform a full range of light work based on additional limitations, she enlisted the assistance of the Vocational Expert to determine the extent of the erosion of the unskilled light occupational base.  (R. 35.)  Based on the testimony of the VE that jobs exist in the national economy which a person of Plaintiff's age, education, work experience and RFC since December 2011 could perform, the ALJ concluded that a finding of "not disabled" was appropriate.  (R. 35.)

## II. Disabity Reassessment Process

Pursuant to 42 U.S.C. § 423(f)(1), a benefit recipient may be deemed ineligible for benefits if it is determined that his "disability has ceased, when that determination is supported by

17

substantial evidence of medical improvement and the claimant is
able to engage in substantial gainful activity.  20 C.F.R. §
416.994(b)(5) provides a seven-step test under which termination-
of-benefits inquiries are to be conducted." *Reefer v. Barnhart*,
326 F.3d 376, 378 n.1 (3d Cir. 2003).

At step one, the ALJ must determine whether the claimant has
an impairment or combination of impairments which meets or
medically equals the criteria of a listed impairment, and, if the
claimant does, his disability continues.  20 C.F.R. §
416.994(b)(5)(i).  At step two, the ALJ must determine whether
medical improvement has occurred: if it has, the analysis proceeds
to the third step; if not, the analysis proceeds to the fourth
step.  20 C.F.R. § 416.994(b)(5)(ii).  At step three, the ALJ must
determine whether medical improvement is related to the ability to
work, i.e, whether there has been an increase in the RFC based on
impairments present at the CPD--if so, the analysis proceeds to the
fifth step; if not, the analysis proceeds to step four.  20 C.F.R.
§ 416.994(b)(5)(iii).  Step four, where the ALJ makes a
determination if an exception to medical improvement applies, is
applicable where it has been determined at step two that there has
been no medical improvement or at step three the improvement was
found not related to the ability to work.  20 C.F.R. §
416.994(b)(5)(iv).  At step five, the ALJ must determine whether
all the claimant's current impairments in combination are severe:

18

if all current impairments in combination do not significantly
limit the claimant's ability to do basic work activities, the
claimant is no longer disabled; if they do, the analysis proceeds
to the next step.  20 C.F.R. § 416.994(b)(5)(v).  At step six, the
ALJ must assess the claimant's residual functional capacity based
on the current impairments and determine if he can perform past
relevant work: if the claimant has the capacity to perform past
relevant work, his disability has ended; if not, the analysis
proceeds to the last step.  20 C.F.R. § 416.994(b)(5)(vi).  At the
last step, the ALJ must determine whether other work exists that
the claimant can perform, given his residual functional capacity
and considering his age, education, and past work experience: if
the claimant can perform other work, he is not longer disabled; if
the claimant cannot perform other work, his disability continues.
20 C.F.R. § 416.994(b)(5)(vii).

Here ALJ Wordsworth noted that

> [a]lthough the claimant generally continues
> to have the burden of proving disability at
> this step, a limited burden of going forward
> with the evidence shifts to the Social
> Security Administration.  In order to support
> a finding that an individual is not disabled
> at this step, the Social Security
> Administration is responsible for providing
> evidence that demonstrates that other work
> exists in functional capacity, age,
> education, and work experience.

(R. 26.)

### III. Standard of Review

19

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to

analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final

decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See, e.g., Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.")). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). It is the ALJ's responsibility to explicitly provide reasons for his decision and analysis later provided by the defendant cannot make up for analysis lacking in the ALJ's decision. *Fargnoli v. Massanari*, 247

22

F.3d 34, 42, 44 n.7 (3d Cir. 2001); *Dobrowolsky*, 606 F.2d at 406-
07.  Neither the reviewing court nor the defendant "may create or
adopt post-hoc rationalizations to support the ALJ's decision that
are not apparent from the ALJ's decision itself."  *Hague v. Astrue*,
482 F.3d 1205, 1207-08 (10th Cir. 2007); *see also Motor Vehicle
Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29,
50 (1983) (citations omitted) ("It is well-established that an
agency's action must be upheld, if at all, on the basis articulated
by the agency itself.")

## IV. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the
substantial evidence standard regarding the matters at issue here,
we note the Third Circuit has repeatedly emphasized the special
nature of proceedings for disability benefits.  *See Dobrowolsky*,
606 F.2d at 406.  Social Security proceedings are not strictly
adversarial, but rather the Social Security Administration provides
an applicant with assistance to prove his claim.  *Id.*  "These
proceedings are extremely important to the claimants, who are in
real need in most instances and who claim not charity but that
which is rightfully due as provided for in Chapter 7, Subchapter
II, of the Social Security Act."  *Hess v. Secretary of Health,
Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such,
the agency must take extra care in developing an administrative

record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**B.  *Plaintiff's Alleged Errors***

As set out above, Plaintiff asserts the decision of the Acting Commissioner should be reversed because of the following errors: 1) Plaintiff proved disability through November 30, 2011 (Doc. 15 at 3-4); 2) medical improvement had not occurred as of December 1, 2011 (*id.* at 4-12); 3) the ALJ relied on a flawed and incomplete hypothetical question to the VE (*id.* at 12-15); and 4) the ALJ improperly rejected the opinion of treating physician Dr. Donald Mandetta (*id.* at 15-18). Our inquiry focuses on the ALJ's determinations that medical improvement had occurred as of December 1, 2011, and Plaintiff was able to engage in substantial gainful activity as of that date. We address Plaintiff's claimed errors in that context.

**1.    Medical Improvment as of December 1, 2011**

Plaintiff first asserts he proved disability through November 30, 2011, and medical improvement had not occurred as of December 1, 2011. (Doc. 15 at 3-12.) We disagree.

Plaintiff sets out a comparison of findings recorded during

the period of disability and findings on or after December 1, 2011, asserting there is no fundamental difference.  (*Id.* at 4-12.) Defendant maintains that Plaintiff's argument misconstrues the sequential evaluation process applied to his case and the evidence of improvement cited by the ALJ.  (Doc. 20 at 6.)

Having concluded that Plaintiff did not have an impairment or combination of impairments which met or equaled a listing at step one of the seven step sequential process used to determine whether a claimant's disability continues (R. 27), the ALJ's next step was to determine if medical improvement had occurred.  20 C.F.R. § 416.994(b)(5).  "Medical improvement" is defined as

> any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled.  A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s).

20 C.F.R. § 416.994(b)(1)(i).  As noted above, here the most recent favorable decision, known as the "comparison point decision" ("CPD"), is dated March 29, 2010.  (R. 26.)

The ALJ cited numerous examination notes in support of her decision that medical improvement had occurred since March 29, 2010, beginning with January 2011 treatment notes.  (R. 30, 31.) Contrary to Plaintiff's assertion (Doc. 15 at 6, 7 n.6), the ALJ did not err in citing notes from this time period in support of her

decision--as per the regulation and common sense, medical improvement is most often a process.[1]  The ALJ cited evidence regarding the status of Plaintiff's Crohn's disease and, importantly, cited evidence related to his overall condition and the status of symptoms Plaintiff claimed to be disabling, primarily the frequency of bowel movements.  (R. 31-32.)  Thus, Plaintiff's argument that the ALJ erred by emphasizing the status of his Crohn's disease (Doc. 15 at 10-12) is without merit.

As set out above, substantial evidence supports the ALJ's decision that medical improvement occurred--the ALJ accurately assessed that there had been a decrease in the medical severity of Plaintiff's impairment which was present in March 2010 based on changes (improvement) in the symptoms associated with his impairment.  *See* 20 C.F.R. § 416.994(b)(1)(i).  Plaintiff's treating gastroenterologist, Dr. Mandetta, verified improvement and decrease in symptoms in his office notes as did examining CRNP, Ms. Hoover.  (R. 344, 466, 480.)  Dr. Legaspi's opinion found significant medical improvement as of December 2, 2011.  (R. 371-72.)  Though not specifically cited by the ALJ, evidence relied on by Dr. Legaspi in her opinion which was afforded some weight by the ALJ (R. 34)--a March 2011 new patient visit to the Family Practice Center--indicates that Plaintiff reported that he was doing well,

---

[1]  Plaintiff does not assert that the ALJ ran afoul of 20 C.F.R. § 416.994(b)(6), the regulation addressing how it is determined when a claimant's disability ended.

26

rarely needed the medication he took for loose stools, and denied fatigue, malaise, diarrhea, nausea and vomiting.  (*See* R. 363, 372.)

Because substantial evidence supports the ALJ's decision that medical improvement had occurred after March 29, 2010, Plaintiff's claimed error to the contrary is without merit.

## 2.   **Vocational Expert Testimony**

Plaintiff contends that the ALJ committed reversible error by relying on a flawed hypothetical question to the VE.  (Doc. 15 at 12-15.)  We conclude this claimed error is a basis for remand.

The Third Circuit Court of Appeals has held that to accurately portray a claimant's impairments, the ALJ must include all "credibly established limitations" in the hypothetical. *Rutherford*, 399 F.3d at 554 (citing *Plummer v. Apfel*, 186 F.3d 422, 431 (3d Cir. 1999)).  In *Zirnsak v. Colvin*, 777 F.3d 607 (3d Cir. 2014), our Circuit Court summarized the framework set out in *Rutherford* for consideration of whether a limitation is credibly established:

> First, limitations that are supported by medical evidence and are "otherwise uncontroverted in the record" *must* be included in the ALJ's hypothetical for us to rely on the VE's response to that hypothetical. [*Rutherford*, 399 F.3d at 554]. However, where a limitation is supported by medical evidence, but is opposed by other evidence in the record, the ALJ has discretion to choose whether to include that limitation in the hypothetical.  *Id.*  This discretion is not unfettered--the ALJ cannot

> reject evidence of a limitation for an
> unsupported reason. *Id.* Finally, the ALJ
> also has the discretion to include a
> limitation that is not supported by any
> medical evidence if the ALJ finds the
> impairment otherwise credible.

777 F.3d at 614-15 (citing *Rutherford*, 399 F.3d at 554).

Specifically, Plaintiff alleges the ALJ relied on a
hypothetical that did not take into account evidence about the
effect of Plaintiff's diarrhea on his ability to work and the
inclusion of "required ready access to the restroom" was too vague
to have any vocational significance. (*Id.* at 13 (citing R. 30-
31).) The perceived importance of this omission is based on
Plaintiff's averment that "[h]ad the ALJ accepted the testimony of
Mr. Neff, or his contemporaneous log of daily bowel movements, or
the opinion of his treating gastroenterologist Dr. Mandetta,
Plaintiff would exceed the permitted time off-task," the VE having
testified that "'the employer would not permit 20 percent being off
task[,] 10 percent of the time would be permitted, or six minutes
of every hour.'" (Doc. 15 at 14 (quoting R. 76).) Plaintiff
points to his bowel log, his Function Report, and Dr. Mandetta's
Medical Source Statements of January 19, 2012, and December 5,
2012, indicating the need for bathroom breaks up to twenty times
per day and bowel movements ranging from 20 to 50 per week. (Doc.
15 at 14.)

While Plaintiff calls this evidence "uncontroverted" (Doc. 15

28

at 14), the review of evidence set out above indicates otherwise.[2]
Because the evidence cited by Plaintiff was not uncontroverted, ALJ
Wordsworth had discretion whether to include it in the hypothetical
but she was required to provide a reason for doing so--the ALJ
cannot reject evidence of a limitation for an unsupported reason.
*See*, *Zirnsak*, 777 F.3d at 614-15.  Our review of ALJ Wordsworth's
decision does not indicate that she provided an adequate reason for
rejecting evidence about Plaintiff's bowel habits provided by Dr.
Mandetta.  The ALJ does not directly discuss the issue at all, and
she provides the following rationale for affording little weight to
Dr. Mandetta's opinions in general: "Dr. Mandetta's treatment and
progress notes show that the claimant has had limited treatment and
further shows that the claimant's Crohn's disease was not active.
In fact, in February 2013, the treatment notes show and the

---

[2] For example, October 2012 was the last time Plaintiff saw
Dr. Mandetta before Dr. Mandetta stated in the December 5, 2012,
Medical Source Statement that Plaintiff "reports 35-50 bowel
movements/week" (R. 443).  In October 2012 Dr. Mandetta recorded
that Plaintiff's bowel movements averaged 35-50 per week, but he
also stated that Plaintiff had "1-5 bowel movements a day depending
on his diet and whether or not he takes Colestid." (R. 480.)  Dr.
Mandetta stated in the same note that Plaintiff could reduce the
number of bowel movements by taking the Colestid regularly but he
did not do so.  (*Id.*)  In his review of evidence, the ALJ cited the
facts that Plaintiff had not been compliant with treatment and had
not been cooperative with diagnostic studies as well as decreased
bowel movement frequency.  (R. 32.)  Further evidence supporting
the ALJ's omission of the frequency of restroom breaks/bowel
movements asserted by Plaintiff and Dr. Mandetta is found in the
February 2013 notes of Plaintiff's visit with Ms. Hoover, a CRNP at
Mt. Nittany Physician Group, where she recorded that Plaintiff
denied diarrhea and rectal urgency.  (R. 466.)

claimant was without any evidence of active Crohn's disease."  (R. 34 (citing Exhibits 10F, 12F, 13F, 14F and 15F).)

As argued by Plaintiff (Doc. 15 at 16-18) and supported by the record, the presumption that Plaintiff's Crohn's disease was inactive does not mean that his reported symptoms and those recorded by Dr. Mandetta were unfounded.  Similarly, limited treatment, without more, does not provide a basis to discount the only treating medical source opinion of record.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  The "treating physician rule," is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).

The Court of Appeals for the Third Circuit addressed a

30

plaintiff's argument that an ALJ failed to give controlling weight
to the opinion of a treating physician in *Horst v. Commissioner of
Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not
precedential).

> Controlling weight is given when a treating
> physician's opinion is "well supported by
> medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent
> with the other substantial evidence." 20
> C.F.R. § 404.1527(d)(2). "Although the ALJ
> may weigh the credibility of the evidence, he
> must give some indication of the evidence that
> he rejects and his reason(s) for discounting
> that evidence." *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46.

Within this legal framework, we conclude the ALJ's decision is
lacking for two reasons: 1) the failure to articulate what
limitations were credibly established under the *Rutherford*
standard, *see* 399 F.3d at 554; and 2) the failure to adequately
explain her reasons for the weight afforded the opinions of Dr.
Mandetta as required by statute and caselaw related to the treating
physician rule.

While Defendant provides reasons to reject/afford limited
weight to Dr. Mandetta's opinions in her opposition brief (Doc. 20
at 14) and we may similarly be able to do so, neither the Court nor
the Defendant may provide a post hoc reason for a determination
which was the ALJ's responsibility to articulate.  As set out
above, it is the ALJ's responsibility to explicitly provide reasons
for her decision and analysis later provided by the defendant

cannot make up for analysis lacking in the ALJ's decision. *Fargnoli*, 247 F.3d at 42, 44 n.7; *Dobrowolsky*, 606 F.2d at 406-07. Neither the reviewing court nor the defendant "may create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Hague*, 482 F.3d at 1207-08; *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50.

The foregoing analysis indicates that this matter must be remanded to the Acting Commissioner for further proceedings to, at a minimum, clarify the consideration of Plaintiff's claimed limitations and articulate the reasons for the weight afforded the treating physicians' opinions.

### V. Conclusion

For the reasons discussed above, we conclude Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: August 13, 2015